UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HANY G. CHOULAGH,

    Plaintiff,

v.

ERIC H. HOLDER, JR., Attorney General,
Department of Justice,

    Defendant.
_____/

CASE NO. 10-14279

HON. MARIANNE O. BATTANI

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 29). The Court heard oral argument on May 17, 2012, and at the conclusion of the hearing took the motion under advisement. For the reasons that follow, the Court **GRANTS** Defendant's motion.

**I.    STATEMENT OF FACTS**

    **A.    The Parties**

Plaintiff Hany Choulagh is sixty-four year old man of Iraqi national origin who began working for Defendant Federal Bureau of Investigation ("FBI"), Detroit Division, as a Language Analyst ("LA") contractor in October 2005. LA's provide translation services to the FBI. He ultimately joined the FBI as a direct hire in March 2007. Michael Boyden, a white American male, became Plaintiff's supervisor in December 2008.

### B. Plaintiff's April 2009 EEO Testimony

On March 24, 2009, Plaintiff received an email from the FBI's Office of the General Counsel advising him that he had been approved to testify in early April on behalf of a former employee Kinana Jacobs regarding her EEO complaint against the FBI. (Doc. 31 Ex. 9). Plaintiff advised Jean Younes, a LA supervisor not in his chain of command, that he was going to present testimony in favor of Jacobs. Plaintiff says Younes told him that if he testified, he should expect consequences. Younes denies discouraging Plaintiff from testifying. (Doc. 29 Ex. 3 at p. 9).

### C. Plaintiff's First Alleged Sleeping Incident

On March 30, 2009, Boyden observed Plaintiff sleeping at his desk. (Doc. 29 Ex. 8 at p. 3-4). Nazih Moaikel, an LA whose desk was near Plaintiff's, also observed Plaintiff asleep at his desk. (Doc. 29 Ex. 8 at p. 4; Ex. 9, ¶ 3). Plaintiff denied he was sleeping and explained that he had bronchitis and was on medication that might have made him drowsy. (Doc. 29 Ex. 1 at pp. 7-8).

On April 1, 2009, while Plaintiff was out on sick leave, Boyden sent Plaintiff an email about the alleged sleeping event. (Doc. 29 Ex. 10). When Plaintiff read this email after returning to work, he became upset and demanded an apology from Boyden. (Doc. 29 Ex. 12). After this confrontation, Plaintiff sought treatment for bronchitis and was out of the office on sick leave from April 6 to 8.

### D. Boyden Refers Plaintiff to the EAP

In addition the alleged sleeping incident, throughout early April 2009, Boyden noticed a change in Plaintiff's physical appearance and stress levels. He discussed these observations with his then-supervisor, Assistant Special Agent in Charge Walter

Reynolds. Reynolds concurred with Boyden's assessment and suggested to Boyden that he possibly refer Plaintiff to the Employee Assistance Program ("EAP"), a confidential program to help federal employees with personal problems.

In a memorandum dated April 9, 2009, given to Plaintiff on April 10, 2009, Boyden referred Plaintiff to the EAP by stating:

> The Purpose of the memorandum is to express my personal concern for your welfare, and to address your recent irritability, agitated demeanor and trouble with sleep in the Detroit Field Office/Language Services Section, which I feel indicate a need for professional counseling. Combining this with your documented medical issues, I am convinced this assistance is important for your well-being.
>
> You have been under my direct supervision for approximately four months. During this time I have had some issues with you getting along with other employees to include a request by you and two of your three cubicle mates for a move to a different desk.
>
> During the past two weeks you have complained openly to employees inside and outside of the language unit regarding your interactions with me and my attempts to address issues raised by your behavior. I have tried on multiple occasions in writing and in-person over the past two weeks to address these issues and have concluded that attempting to discuss these issues with you has not been effective and that the problem emanates from an external factor.
>
> I feel that my personal involvement is not of help and I strongly recommend that you seek counseling assistance through EAP. . . .

(Doc. 29 Ex. 17).

Plaintiff states that Boyden wrongfully accused him of having personal problems. However, he decided to go to the EAP as requested. EAP coordinator RN Rita Harrington met with Plaintiff on two separate occasions and concluded he would not benefit from joining the program. (Doc. 32 Ex. 12). Two weeks after Harrington told Boyden that Plaintiff did not need the EAP, Todd Mayberry, a different Assistant Special

3

Agent in Charge, informed the Detroit Division that Harrington will no longer serve in the EAP and that she was replaced by SA Gwen Rosenthal. (Doc. 32 Ex. 13).

### E.     Plaintiff's Second Alleged Sleeping Incident and the Desk Move

On May 18, 2009, Boyden again allegedly observed Plaintiff sleeping at his desk. The next day, Boyden met with Younes and Reynolds to discuss Plaintiff's workplace behavior issues. They decided to move Plaintiff's desk closer to Boyden's office so that Boyden could monitor Plaintiff throughout the day. Plaintiff refused to move his desk, and other employees heard him yelling at Boyden. (Doc. 32 Ex. 19). Plaintiff said this move would put him near a common work area where other employees signed in, gathered to mingle and get their coffee, make copies, and generally congregate to talk. As a result, it would be distracting and difficult for him to concentrate while translating. On May 20, 2009, with Reynolds' assistance, Boyden ultimately moved Plaintiff's desk closer to his office.

### F.     Boyden Limits Plaintiff to On-Site Duties

Also on May 20, 2009, Boyden told Plaintiff that he was limiting Plaintiff to on-site duties. (Doc. 29 Ex. 22). This meant that Plaintiff could not apply for temporary duty assignments ("TDY"), off-site assignments which were outside of the Detroit Division. Boyden stated "this was a result of [Plaintiff's] inappropriate and disruptive behavior and his insubordination." (Doc. 29 Ex. 8 at p. 8). In a memo to Reynolds, Boyden said that he told Plaintiff that "his recent demeanor and refusal to follow directions from management made it inappropriate for him to represent the unit" outside of the Detroit Division. (Doc. 29 Ex. 18 at p. 2). Plaintiff states Boyden's actions modified the terms

4

of his employment and damaged his advancement opportunities because off-site duties and appointments are necessary for promotions and superior job performance ratings.

### G. Boyden's Denial of Temporary Duty Assignment #1

In late May 2009, FBI HQ sent a canvas regarding a one-year TDY to a foreign country ("TDY#1"). (Doc. 29 Ex. 23). Plaintiff sought Boyden's approval to apply for TDY#1; Boyden denied the request because he had just restricted Plaintiff to on-site duties. Boyden approved the request of another LA, who was of Iraqi national origin, to apply for that post.

To circumvent Boyden's restrictions and avoid the chain of command, it appears Plaintiff asked Younes to approve his request to apply to other TDYs while Boyden was out of the office. Boyden discovered Plaintiff's actions, and reminded Plaintiff that he was ineligible to apply to any TDYs in an email and a phone call. (Doc. 32 Ex. 19).

### H. Boyden Places Plaintiff on a Performance Improvement Plan

Also in late May 2009, Boyden sent a detailed memo to FBI HQ requesting approval to place Plaintiff on a Performance Improvement Plan ("PIP"). (Doc. 29 Ex. 32). FBI HQ approved the request and on June 23, 2009, Boyden placed Plaintiff on a PIP. (Doc. 29 Ex. 29). The six-page, single-spaced PIP outlined Plaintiff's behavior problems and set forth the steps he must take to improve performance.

As part of the PIP, Boyden required Plaintiff to account for his daily activities and imposed telephone use and other limitations. (Doc. 29 Ex. 31). Boyden instituted these requirements because he observed, and received information from others, that Plaintiff was disrupting co-workers and he was often away from his desk unrelated to his

work. Boyden also believed that Plaintiff's telephone use was excessive and disruptive because his translation work did not require frequent telephone use.

Plaintiff states, without citation, that no other employee in the "entire FBI" was required to keep such detailed worklogs. He also suggests Boyden made Plaintiff file these logs so that he could gather "ammunition" to support Plaintiff's termination.

In September 2009, Boyden believed Plaintiff's job performance rating for "relating with others and providing professional services" had improved one level from "unacceptable" to "minimally successful." (Doc. 29 Ex. 1 at p. 12.). As a result, on September 23, 2009, Boyden decided to "pass" Plaintiff on the PIP. (Doc. 29 Ex. 36). Plaintiff claims that despite passing the PIP, its "restrictions" were never removed.

### I.      Plaintiff's August 2009 EEO Complaint

In August 2009, Plaintiff filed the first EEO complaint giving rise to this case. (Doc. 29 Ex. 7). Plaintiff states: "I am filing a complaint of discrimination because of my Iraqi national origin and because of reprisal because of my prior EEO activity." (Id.). Plaintiff claimed Boyden's disciplinary actions were motivated by national origin discrimination and retaliation for Plaintiff's EEO activity, i.e., his testimony in the Jacobs matter and some unidentified unfair labor practice charge that was apparently withdrawn.

### J.      Plaintiff's "Not Satisfactory" Quality Control Ratings in Fall 2009

In October 2009, an FBI quality control reviewer rated Plaintiff's translation as "Not Satisfactory." (Doc. 29 Ex. 40). The FBI's quality control program is "double blind in that the reviewer does not know who the linguist is . . . and the linguist is unaware of who the reviewer is or the field office they work in." (Doc. 29 Ex. 37 at p. 6; Ex. 38 at

p. 4). In other words, Boyden did not perform the quality control review or otherwise rate Plaintiff's translation work. Plaintiff signed this review, which stated that he "accepts that some of it could have been done better." (Doc. 29 Ex. 41).

On November 3, 2009, Boyden gave Plaintiff a memo stating that a quality control reviewer had rated his work "Not Satisfactory" two consecutive times, once in July 2009 and most recently in October 2009. (Doc. 29 Ex. 40). In that memo, Boyden notified Plaintiff that further quality issues might lead to the issuance of a "warning" performance appraisal report. Boyden avers that Plaintiff reacted angrily to this memo. (Doc. 29 Ex. 37 at p. 4).

### K.     Boyden's December 2009 Termination Memo

On December 1, 2009, Boyden prepared a draft memo summarizing the difficulties he had with Plaintiff to determine whether he should be terminated. (Doc. 29 Ex. 35). In addition to the quality control incidents, Plaintiff continued to have problems with excessive personal telephone use and Boyden had observed Plaintiff sleeping at his desk on two additional occasions. (Doc. 29 Ex. 26 ¶ 4; Ex. 34; Ex. 35 at pp. 2-3). Defendant states Boyden never formally submitted the memo to FBI HQ and Plaintiff remains employed with the FBI.

### L.     The February 2010 Doctor's Note Incident

Plaintiff was on sick leave from February 2-4, 2010. On February 5, 2010, Plaintiff brought in a doctor's note and gave it to Boyden. (Doc. 29 Ex. 43 at p. 3). Boyden initially accepted the note as legitimate. Later, however, he had second thoughts and conducted a closer examination. According to Boyden, the doctor's note appeared to describe medical care for two days beyond the date of the note. (Doc. 29

Ex. 43 at p. 4; Ex. 44). He also saw the note had white-out on it and thought it contained inconsistent handwriting from two different people. Boyden told Plaintiff he intended to call Plaintiff's doctor to verify the authenticity of the note; Boyden verified the note and approved Plaintiff's sick leave for February 2-4, 2010. (Doc. 29 Ex. 42 at p. 3).

### M. Boyden's Denial of Other Off-Site Duties

On February 12, 2010, FBI HQ sought LAs to participate in a High-Value Interrogation Group ("HIG"). (Doc. 29 Ex. 45). The HIG was an interagency team being created to deploy worldwide with little or no notice when a high-value target was in custody. Boyden denied Plaintiff's request to apply because he had requested sick leave on 21 occasions in less than a year and also due to the fact that HIG was a collateral duty in addition to his regular translation work. Instead, Boyden recommended LA Elie Sassine, who is of Lebanese national origin, and LA Vian Raikany, who is of Iraqi national origin, for the HIG; FBI HQ selected Sassine.

In March 2010, FBI HQ canvassed the LAs regarding two other TDYs. (Doc. 29 Ex. 46; Ex. 47). Plaintiff emailed Boyden and expressed an interest in applying to both. Boyden again denied Plaintiff's request to apply because (1) the Special Agent in Charge said no one could apply for any TDYs without prior authorization from the front office; (2) too many LAs from Detroit were already serving TDYs and (3) Plaintiff still had had problems with absenteeism and work performance. (Doc. 29 Ex. 45).

### N. Plaintiff's Personal Phone Use in March 2010

Also in March 2010, Boyden received additional complaints about Plaintiff from his coworkers. (Doc. 29 Ex. 49). They, and Boyden, both observed excessive personal telephone use and frequent absences from his desk. Boyden ultimately directed

8

Plaintiff to keep his cell phone in his desk drawer and document his time away in excess of fifteen minutes (not counting breaks and lunch).

### O.  Plaintiff's April 2010 EEO Complaint

In April 2010, Plaintiff filed the second EEO complaint giving rise to this case. (Doc. 29 Ex. 50).  Plaintiff states:  "I am filing a complaint of discrimination because of perception of disability (I got punished for using earned sick time) and because of reprisal because of my prior EEO activity which is still going on."  (Id.).  He essentially claimed that the events from December 2009 through March 19, 2010, constituted retaliation for him having filed the first EEO complaint in August 2009.

### P.  The Federal Suit

On October 25, 2010, Plaintiff filed the instant action against Defendant for national origin discrimination and Title VII retaliation.  (Doc. 1).  Plaintiff subsequently filed an amended complaint.  (Doc. 5).  Defendant filed a motion for summary judgment on Plaintiff's entire amended complaint.  (Doc. 29).  The Court heard oral argument on May 17, 2012.  Defendant's motion is now before the Court.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the

burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Id., 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III.   ANALYSIS

Plaintiff brings one count of national origin discrimination under Title VII and three counts of Title VII retaliation against Defendant. "In Title VII actions it is important to distinguish between harassment and discriminatory harassment in order to ensure that Title VII does not become a general civility code." Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000) (citations omitted). A court properly applies Title VII to employment claims by filtering out complaints attacking the ordinary tribulations of the workplace. Swanson v. Livingston County, 270 F.Supp.2d 887, 899 (E.D. Mich. 2003).

"[F]ederal law does not guarantee a utopian workplace or even a pleasant one. Personality conflicts between employees are not the business of the federal courts." Michael v. Caterpillar Fin. Services Corp., 496 F.3d 584, 600 (6th Cir. 2007) With these principles in mind, the Court begins its analysis with Plaintiff's national origin discrimination claim.

### A. National Origin Discrimination

Title VII of the Civil Rights Act of 1964 prohibits an employer from making an adverse employment decision based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. A plaintiff can bring two types of claims for discrimination under Title VII: (1) claims based on "discrete discriminatory acts," and (2) claims alleging a "hostile work environment." Hunter v. Sec'y of the Army, 565 F.3d 986, 993-94 (6th Cir. 2009) (citations omitted). Plaintiff advances a "hostile work environment" theory in this case. (Doc. 5 at ¶ 59).

To establish a prima facie hostile work environment claim, a plaintiff must show that: (1) he is a member of a protected class, (2) he was subjected to unwelcome verbal or physical conduct related to his membership in that class, (3) the harassment was based on his membership in that class, (4) the harassment had the purpose of creating an intimidating, hostile, or offensive work environment that is severe or pervasive, and (5) the employer knew or should have known about the harassment, but failed to take any action to prevent it. Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir. 2009).

If a prima facie case has been established, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, i.e., the creation of a hostile work environment. McDonnell Douglas Corp. v. Green, 411

U.S. 792, 802 (1973). If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. Id., at 804. A court need not apply the burden shifting analysis if the plaintiff has direct evidence that the employer acted with discriminatory motive. See Ang v. Proctor & Gamble Co., 932 F.2d 540 (6th Cir. 1991).

  Here, the Court finds that Plaintiff cannot establish the prima facie case because there is no evidence that the complained of disciplinary incidents upon which his hostile work environment claim is based were related to Plaintiff's Iraqi national origin. The well-developed factual record does not contain any evidence to support Plaintiff's assertion that Boyden considered his national origin when issuing discipline during the relevant timeframe. To the contrary, Boyden's disciplinary actions were justified in light of Plaintiff's workplace behavior.

  Plaintiff offers no evidence to dispute that: Boyden and a witness observed Plaintiff sleeping at his desk in March 2009; that Boyden has never observed one of his other supervisees sleeping at their desks; that Boyden and Reynolds observed a deterioration in Plaintiff's workplace attitude and appearance; that Boyden received complaints about Plaintiff from other LAs; that Boyden observed Plaintiff sleeping at his desk in May 2009; that Plaintiff was insubordinate, yelled at Boyden, and refused to follow orders to move his work station and follow the chain of command; that Plaintiff received consecutive "not satisfactory" quality control ratings following a double-blind review; that Plaintiff had excessive absenteeism during the relevant time period; and that Boyden and other employees observed Plaintiff engaging in excessive personal telephone use. Plaintiff cannot create a genuine issue of material fact by ignoring the

absence of any discriminatory animus in the record and constructing the prima facie case with his subjective belief that Defendant considered his national origin a material factor in issuing discipline. The evidence of record prevents a reasonable jury from concluding that Defendant's discipline decisions were based on, or related to Plaintiff's Iraqi national origin.

Further, even if the Court assumes Defendant's disciplinary actions were based on Plaintiff's national origin, these actions do not amount to a hostile work environment. To carry the burden of establishing a hostile work environment, Plaintiff must show that his workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" Barrett, 556 F.3d at 514 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The employer's conduct "'must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.'" Id. (quoting Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999)). Here, although Plaintiff believed the environment was abusive, the complained of disciplinary actions, from an objective perspective, are not severe or pervasive enough to constitute a work environment that is permeated with harassment based on Plaintiff's national origin. See McCombs v. Meijer, Inc., 395 F.3d 346, 357 (6th Cir. 2005) Accordingly, Defendant is entitled to summary judgment on Plaintiff's national origin discrimination claim.

### B. Title VII Retaliation

In Counts I, II, and IV, Plaintiff alleges Defendant retaliated against him for engaging in three different types of Title VII protected activity during three separate time periods. To establish a prima facie case of Title VII retaliation, Plaintiff must prove that: (1) he participated in an activity protected by Title VII; (2) the employer knew of his participation; (3) following his participation, an adverse employment action occurred or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal link between the protected expression and the adverse action or harassment. Hunter, 565 F.3d at 995-996 (citations omitted). If this showing is made, Defendant "must articulate a legitimate nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation," and that retaliation was the real reason. Harris v. Metro. Gov't of Nashville, 594 F.3d 476, 485-86 (6th Cir. 2010).

In Count I, Plaintiff alleges he was retaliated against for having engaged in some unidentified Title VII protected activity. (Doc. 5 at ¶¶ 47-49). At the hearing, Plaintiff explained that his agreement or authority to participate in Jacobs' EEO case on March 24, 2009, as distinguished from his actual testimony in that case, constitutes the protected activity in Count I. As such, Count I captures a short timeframe because Count II addresses Defendant's alleged retaliation for Plaintiff's actual testimony in the Jacobs' EEO case on April 9, 2009. In other words, Count I is based on the alleged retaliation which occurred only because of Plaintiff's agreement to testify rather than his actual testimony.

During the timeframe that Count I covers, the record reveals two alleged retaliatory actions: (1) Boyden's confrontation with Plaintiff regarding the March 30, 2009 sleeping incident and the April 9, 2009 memo referring Plaintiff to the EAP program. Regarding the sleeping incident, assuming Boyden knew Plaintiff was going to testify in Jacobs' EEO case, and even assuming Boyden wrongfully accused Plaintiff of sleeping at his desk because of his agreement to testify, the complained of retaliation, i.e., an email reprimanding Plaintiff for sleeping at his desk and a private meeting with Boyden regarding the incident, cannot reasonably be considered an adverse employment action or severe or pervasive retaliatory harassment. Boyden's actions are of a "de minimis nature and amount to nothing more than petty slights and minor annoyances." Hunter, 565 F.3d at 995-97. No sensible jury would conclude otherwise.

Similarly, Boyden's April 9, 2009 memorandum recommending that Plaintiff explore an EAP referral cannot be view as an adverse employment action nor is it sufficient evidence of severe or pervasive retaliatory harassment by a supervisor. The Sixth Circuit has made clear that to show an adverse employment action, a plaintiff must identify a "materially adverse change" in the terms of his employment situation, Kocsis v. Multi-Care Mgt., Inc., 97 F.3d 876, 885 (6th Cir. 1996); Bowman, 220 F.3d at 461–62, and the complained of conduct must be "extreme" to constitute severe or pervasive retaliatory harassment. Ceckitti v. City of Columbus, Dept. of Pub. Safety, Div. of Police, 14 F. App'x 512, 518 (6th Cir. 2001) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Boyden's EAP referral simply does not meet either standard. Accordingly, Defendant is entitled to summary judgment on Count I.

Defendant is also entitled to summary judgment on Count II. In this Count, Plaintiff alleges retaliation based on his testimony in Jacobs' EEO case. (Doc. 5 at ¶¶ 50-54). Although Boyden knew Plaintiff testified, Plaintiff proffers no evidence that Boyden knew whether Plaintiff gave a statement in support of or opposed to Jacobs, and Plaintiff admits that he and Boyden never discussed the content of his testimony. (Doc. 29 Ex. 2 at pp. 10-11; Ex. 16 at pp. 18-19, 22-23, 29). Additionally, other than attenuated temporal proximity, there is no evidence linking Plaintiff's protected activity to the subsequent discipline, i.e., the second alleged sleeping incident, the desk move and duty restriction (almost six weeks later), the PIP (approximately two months later), or the double-blind translation work review (more than six months later). Plaintiff cannot base the prima facie case of retaliation on temporal proximity alone. See Spengler v. Worthington Cyclinders, 615 F.3d 481, 494 (6th Cir. 2010) (citing Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007). The Court therefore finds that Plaintiff has failed to present sufficient evidence from which a reasonably jury could conclude that Defendant retaliated against Plaintiff for testifying in Jacobs' EEO case.

In Plaintiff's response brief, he attempts to include Boyden's EAP referral in Count II. This alleged retaliation arguably remains in Count I because the observations upon which Boyden based the referral occurred *before* Plaintiff testified in Jacobs' EEO case and thus should not be considered in Plaintiff's claim for retaliation *after* he testified. However, given that: (1) it is unclear whether Boyden drafted the April 9, 2009 referral memorandum before or after Plaintiff testified on that same date and (2) that Boyden presented the referral to Plaintiff the day after he testified, Plaintiff can make the argument that the EAP referral should be included in Count II as well. Assuming as

much, while temporal proximity is strong, this incident cannot be view as an adverse employment action nor is it sufficient evidence of severe or pervasive retaliatory harassment for the reasons stated in the analysis of Count I.

The Court will also grant Defendant summary judgment on Count IV. Here, Plaintiff alleges that from December 2009 through March 19, 2010, he was retaliated against for having filed his August 2009 EEO complaint. (Doc. 5 at ¶¶ 61-63). The alleged retaliations at issue include: Boyden's termination memo from December 2009; the sick leave incident in early February 2010; Boyden's denial of Plaintiff's request for the HIG and TDY assignments in March 2010; and Boyden's counseling of Plaintiff regarding his excessive personal telephone use and frequent absences from his desk in March 2010.

In light of the record presented, a reasonable jury could not conclude that Boyden's actions were caused by Plaintiff's protected activity or that those disciplinary incidents amounted to an adverse employment action or severe or pervasive harassment. Boyden never submitted the termination memo to FBI HQ and Plaintiff remains employed with the FBI despite the events of this case. Boyden acted within his discretion by investigating a suspicious doctor's note, see (Doc. 29 Ex. 53 at pp. 23-24), and in any event, ultimately granted Plaintiff paid sick leave during this time. Although Plaintiff was prohibited for applying for TDYs, his normal onsite LA duties remained unchanged and Defendant set forth reasons to deny Plaintiff's requests to apply to off-site jobs that were unrelated to his protected activity. See (Doc. 29 Ex. 43 at pp. 5-6; Ex. 45 at p. 2; Ex. 47 at p. 2). Lastly, Boyden's discussions regarding Plaintiff's excessive personal telephone use and frequent absences from his desk occurred after

17

Boyden received additional complaints about Plaintiff from other LAs and observed problems with Plaintiff himself; there is no reasonable inference that the August 2009 EEO complaint was the likely reason for this incident which occurred nearly six months after Plaintiff engaged in protected activity. Other than conclusory speculation and temporal proximity, which is particularly weak given that complained of incidents began four months after Plaintiff filed his August 2009 EEO complaint, the record contains no evidence that Defendant's disciplinary actions had anything to do with his EEO filing.

Moreover, even if the Court were to find a prima facie case established as to all three retaliation Counts, Plaintiff offers no legitimate response to Defendant's non-retaliatory reasons for discipline. The record clearly sets forth Defendant's rationale behind its disciplinary decisions. Plaintiff has no evidence that these reasons are pretextual. The Court will therefore grant Defendant's motion for summary judgment.

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 29).

**IT IS SO ORDERED.**

> s/Marianne O. Battani
> MARIANNE O. BATTANI
> UNITED STATES DISTRICT JUDGE

DATED: July 16, 2012

## CERTIFICATE OF SERVICE

    I hereby certify that on the above date a copy of this Order was served upon all parties of record, electronically.

s/Bernadette M. Thebolt<br>
Case Manager